AO 442 (Rev. 11/11)  Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | | |
|---|---|---|
| United States of America<br>v.<br>Vincent Ramos (1)<br>■■■■■■■■■■■■■■<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>) | Case No.   **18MJ0973** |

## ARREST WARRANT

To:     Any authorized law enforcement officer

        **YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*   Vincent Ramos                                                                ,

who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment        ☐ Superseding Indictment        ☐ Information        ☐ Superseding Information        ☑ Complaint

☐ Probation Violation Petition        ☐ Supervised Release Violation Petition        ☐ Violation Notice        ☐ Order of the Court

This offense is briefly described as follows:

18 U.S.C. § 1962 (RICO Conspiracy)
21 U.S.C. § 1846 (Conspiracy to Distribute Controlled Substances)

Date:  2/28/18                                            _____
                                                                        *Issuing officer's signature*

City and state:    San Diego, CA                           MITCHELL D. DEMBIN, U.S. Magistrate Judge
                                                                        *Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____<br>at *(city and state)* _____ . |
| Date: _____              _____<br>                                                                *Arresting officer's signature*<br><br>                                                                _____<br>                                                                *Printed name and title* |





**FILED**

MAR 0 1 2018

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA



**UNITED STATES OF AMERICA,**

vs.

Vincent Ramos (1)
  aka "CEO"
  aka "Business"

Defendants.

Magistrate Case No. **18MJ0973**

COMPLAINT FOR VIOLATION OF
Title 18, U.S.C., Sec. 1962(d) —
**Racketeering Conspiracy to
Conduct Enterprise Affairs (RICO
Conspiracy)**; Title 21, U.S.C., Sec. 846
**– Conspiracy to Distribute
Narcotics;** and Title 18, U.S.C., 2 –
**Aiding and Abetting;**


**(UNDER SEAL)**

The undersigned complainant being duly sworn states:

### COUNT I

Beginning at least as early as 2008 and continuing up to and including February 28, 2018, within the Southern District of California and elsewhere, defendants VINCENT RAMOS, ██████████████████████████, and others, being persons employed by and associated with PHANTOM SECURE, which was engaged in, and the activities of which affected interstate and foreign commerce, did knowingly and intentionally conspire with each other, and with others, to violate Title 18, United

States Code, Section 1962(c), that is to conduct and participate, directly and indirectly, in the conduct of PHANTOM SECURE's affairs through a pattern of racketeering activity involving gambling, money laundering, and drug trafficking, indictable under state law and punishable by imprisonment for more than one year and the following provisions:

> A.    Title 21, United States Code, Section 846 (Attempt and conspiracy to distribute and import controlled substances); and
>
> B.    Title 18, United States Code, Sections 1512 (Obstruction)

2.    It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of PHANTOM SECURE's affairs.

## COUNT II

Beginning as early as 2008 and continuing up to and including February 28, 2018, within the Southern District of California, defendants VINCENT RAMOS, █████████ █████████████████████████████████████████████████████ ████████, did knowingly and intentionally conspire with other persons to distribute more than 5 kilograms of cocaine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1) and 846, and Title 18, United States Code, Section 2.

This complaint is based on the facts in the attached probable cause statement, which is incorporated herein by reference.

Nicholas I. Cheviron
FBI Special Agent

Sworn to before me and subscribed in my presence, this 28 day of February 2018.

The Honorable Mitchell D. Dembin
United States Magistrate Judge

2



I, Nicholas Cheviron, being duly sworn, declare and state:

## INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since January 2007. I am currently assigned to the San Diego Division, working as a member of the Organized Crime squad. Prior to my employment with the FBI, I was a police officer with the Bloomington, Illinois, Police Department for approximately three years. I received basic narcotic enforcement training while attending the Illinois Police Training Institute for 12 weeks, in Champaign, Illinois. During my time as a police officer, I received several hours of specialized narcotic enforcement training. I also had the opportunity to investigate and take part in several narcotic investigations. I also received extensive investigative training while attending the FBI Academy at Quantico, Virginia for 21 weeks. During my tenure at the FBI, I have investigated all aspects of criminal organizations to include narcotics trafficking, money laundering, and the operation of illegal gambling businesses. I have interviewed and operated informants, executed search warrants, arrested and interviewed subjects, conducted physical surveillances, utilized electronic and video surveillance, and testified in federal and state courts. Additionally, I have received formal training focusing on criminal enterprises and tactics utilized by such enterprises to generate illicit funds. Those tactics include narcotics trafficking, illegal gambling, and bribery. I have also attended training that focused on the laundering of illicit funds and have participated in numerous working group meetings which focused on illegal gambling and the various methods used to facilitate illegal gambling. In addition my above-stated formal training, I have worked with and consulted numerous agents and law enforcement officers who have investigated criminal organizations throughout the United States, including Southern California. From my training, experience, and consultations, I have become familiar with the techniques and methods utilized by criminal organizations.

2.      Based on my training and experience and the facts as set forth in this Affidavit, I respectfully submit that there is probable cause to believe that violations of

Title 18, United States Code, Section 1962 (RICO), Title 21, United States Code, Sections 841 and 846 (Conspiracy to Distribute a Controlled Substance), and Title 18, United States Code, Section 2 (Aiding and Abetting) have been committed by PHANTOM SECURE, a Canadian company operating a worldwide encrypted telecommunications network; its officers, directors, and employees, including VINCENT RAMOS, █████████, ████████████████████████████, and ████████████████; and its client-customers.

3.     The facts set forth in this Affidavit are based on my personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other domestic and foreign law enforcement officers; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.   Because this affidavit is submitted for the limited purpose of establishing probable cause it does not set forth each and every fact that I or others have learned during the course of this investigation.

### BACKGROUND

3.     Based on the evidence developed in this case, PHANTOM SECURE is a Canadian-based company that sells electronic communication devices and encryption service to transnational criminal organizations to facilitate illegal activity and obstruct and impede law enforcement.

4.     According to reports based on public records and other database searches conducted by the Royal Canadian Mounted Police ("RCMP"), and information learned from confidential sources and undercover recordings discussed below, VINCENT RAMOS, aka "CEO," aka "Business," ("RAMOS") is a citizen of Canada and resident of Vancouver, Canada.   He is the founder and CEO of PHANTOM SECURE.   RAMOS controls PHANTOM SECURE's operations through, in part, the delegation of operational duties to, among others, ████████████████████████████ ██████████████████████████

2



8.     The FBI previously investigated Cooperating Witness One (CW-1), a convicted transnational drug trafficker.[1]  From 2012 through January 2016, CW-1

operated the a criminal enterprise that engaged in international drug trafficking, among other criminal activity. CW-1 was arrested in connection with the operation of the criminal enterprise on September 9, 2015. Marc Emerson, a former resident of Los Angeles, assumed control of the criminal enterprise's drug trafficking operations after CW-1's arrest in September 2015 arrest.[2] According to information received from local authorities and the L.A. coroner's report that I have reviewed, Emerson died from a drug overdose in June 2017. By their own admissions in interviews conducted by FBI agents, CW-1 and Emerson were client-customers of PHANTOM SECURE and used PHANTOM SECURE devices and service to conduct their transnational drug trafficking activity.

## PROBABLE CAUSE A CRIME WAS COMMITTED

9.      Based on the evidence collected and reviewed as part of this investigation, interviews with numerous witnesses, and information learned from many law enforcement sources, as detailed below, I respectfully submit that there is probable cause to believe that PHANTOM SECURE, its officers and directors, VINCENT RAMOS, █████, ██████████████████████████████████, and others, were the leaders, members, and associates of a criminal organization, hereinafter called the PHANTOM SECURE ENTERPRISE, that engaged in acts of aiding and abetting drug trafficking and obstruction of justice.

10.     The PHANTOM SECURE ENTERPRISE constituted an "enterprise," as defined as Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, although not a legal entity. The PHANTOM SECURE ENTERPRISE constituted an ongoing organization whose members functioned as a continuing unit for

[2] This was determined based on an ongoing investigation into CW-1's post-arrest activities, as well as information received from cooperating witnesses, confidential human sources, and eventually by EMERSON's own admissions.

a common purpose of achieving the objectives of the enterprise. The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

A. *Phantom Secure Was Set Up Specifically To Facilitate Criminal Activity*

11.    According to the evidence reviewed as part of this investigation, including interviews with numerous witnesses, undercover operations conducted by Canadian and United States law enforcement, confidential sources from Australia and the United States, cooperating witnesses from the United States and Australia, bank records, corporate documents, and other publicly available documents, PHANTOM SECURE advertisements, and the recorded admissions of RAMOS, ▮▮▮▮▮▮▮▮▮▮, the PHANTOM SECURE ENTERPRISE conducted and aided and abetted the illegal affairs of the transnational criminal organizations as follows:

12.    PHANTOM SECURE operated the encrypted PHANTOM SECURE network, which used PHANTOM SECURE devices to send and receive encrypted messages in furtherance of transnational criminal activity. PHANTOM SECURE's devices and service were specifically designed to prevent law enforcement from intercepting and monitoring communication on the network, and every facet of PHANTOM SECURE's corporate structure was set up specifically to facilitate criminal activity and obstruct, impede, and evade law enforcement.

13.    According on PHANTOM SECURE's own marketing materials and confirmed by our investigation, that of our foreign law enforcement partners, and my personal experience with the devices, I know that PHANTOM SECURE devices are dedicated data devices housed inside a Blackberry handset. PHANTOM SECURE purchases Blackberry handsets from Blackberry Limited and other Blackberry re-sellers. Whereas the standard Blackberry handset is sold to the public with all the customary smartphone functionalities, PHANTOM SECURE's marketing materials state that when PHANTOM SECURE receives the Blackberry handsets, its technical team removes the hardware and software responsible for all external architecture, including voice communication, microphone, GPS navigation, camera, Internet, and

Messenger service.  PHANTOM SECURE then installs Pretty Good Privacy ("PGP") encryption software and "Advanced Encryption Standard" ("AES") on top of an email program, which it routes through encrypted servers located in countries, such as Panama and Hong Kong, believed by PHANTOM SECURE to be uncooperative with law enforcement.  According to PHANTOM SECURE's marketing materials, there are several "advantages of having our servers and a portion of our business located in Panama," including the fact that "Panama does not cooperate with any other country's inquiries…. Panama does not consider tax evasion a crime and as such does not help other countries in their investigations."  According to law enforcement agents who specialize in cyber investigations, to further conceal the location of its key and mail servers, PHANTOM SECURE cloaks them in multiple layers of virtual proxy networks.

14.    As I have learned via attempts to obtain PHANTOM SECURE devices as part of this and previous investigations by foreign law enforcement partners with whom I have discussed the issue, a private citizen cannot simply contact PHANTOM SECURE to purchase a device and subscribe to the service.  Instead, to purchase a device, a new customer must obtain a personal reference or "vouch" from an existing PHANTOM SECURE client-customer.  Once a new client-customer has received such a vouch, PHANTOM SECURE not only verifies the referral from the sponsoring client-customer, but also conducts open source checks to verify the customer's identity.  Like all other aspects of PHANTOM SECURE's business, I believe the purpose of the vouch requirement is to prevent law enforcement from penetrating PHANTOM SECURE's network by limiting PHANTOM SECURE's client-customers to those individuals known to and independently vetted and verified by PHANTOM SECURE.[3]

---

[3] PHANTOM SECURE's vouch and vetting requirements also assure its client-customers that new purportedly criminal associates can be trusted.  For example, when CW-1 was introduced to an undercover agent posing as a drug trafficker, CW-1 required the agent's bona fides to be verified by PHANTOM SECURE.  When PHANTOM SECURE unwittingly provided such a verification, CW-1 wrote to the undercover agent, "I was more worried about u – feel better now seeing u a 2nd time – and finding out from my Phantom [Secure] guys that you've been with the company for a year…All good, now let's go earn."  According to CW-1, he used the

15.   ██████████████████████████████████

██████████████████ According to ████ and based on what I have

learned by procuring PHANTOM SECURE devices via undercover agents in this

investigation, the PHANTOM SECURE ENTERPRISE further endeavors to evade law

enforcement and avoid the consequences of its criminal activity through anonymity.  To

that end, PHANTOM SECURE does not request, track, or record their client-customers'

real names, or other identifying information, instead PHANTOM SECURE interacts

with its clients via username, email handles, or nicknames.

16.   As I know from PHANTOM SECURE devices that have been secured with

the assistance of confidential human sources and undercover agents working with both

agents on this investigation and those working with foreign law enforcement partners,

once a new client-customer initiates service with PHANTOM SECURE, that individual

self-assigns an anonymous, custom email handle.  The individual is also assigned a

domain owned by PHANTOM SECURE, thereby creating the client-customer's

PHANTOM SECURE email address.  Many handles chosen by PHANTOM SECURE

client-customers, are – based on my training and experience – references to drug

trafficking and/or violent crime.  Coupled with the assigned domain, these handles

include:        *leadslinger@freedomsecure.me*;        *The.cartel@freedomsecure.me*;

*The.killa@freedomsecure.me*;    *narco@lockedpgp.com*;    *Trigger-happy@lockedpgp.com*;

*Knee_capper9@lockedpgp.com*;                    *Elchapo66@lockedpgp.com*;

*Time4a187@freedomsecure.me*.

---

term "earn" to mean "mutually conduct drug transactions, thereby generating profit for both
parties."

████████████████████████████████████████

7

17.     According to ███████████ and other law enforcement agents that have secured PHANTOM devices in an undercover capacity, PHANTOM SECURE provides encrypted devices and service to its client-customers at a cost of approximately $2,000 - $3,000 per six-month subscription.

18.     According to ██████, foreign law enforcement partners with technical training, and other sources, PHANTOM SECURE devices communicate almost exclusively on the PHANTOM SECURE network with other PHANTOM SECURE devices.[6]   Client-customers generally create smaller, roughly pyramidal, "closed" networks comprised of members of the same criminal organization who use PHANTOM SECURE.   PHANTOM SECURE devices set up on a closed network can only communicate with other PHANTOM SECURE devices arrayed on the same closed network.

19.     According to CW-1, ██████ and statements made to undercover agents described below, as part of its services, PHANTOM SECURE guarantees that messages stored on its devices can be and will be remotely deleted by PHANTOM SECURE if the device is seized by law enforcement or otherwise compromised.   Through a request to PHANTOM SECURE, the client-customer who established the closed network (or a customer above another in the pyramidal hierarchy) has the ability at any time to contact a PHANTOM SECURE representative in order to remotely wipe the information on their own device or any other device beneath them within the closed network.   To aid and abet criminal activity, PHANTOM SECURE has also suspended the service and

███████████████████████████████████████████████

[6] In limited circumstances, through a vetting process termed "white-listing," a PHANTOM SECURE client-customer can request permission to communicate with an individual on another PGP-encrypted network.

8

deleted the contents of PHANTOM SECURE device, if they suspected law enforcement or an informant was using the PHANTOM SECURE device as part of an investigation.

20.   According to estimates by international law enforcement agents with whom I have met and discussed their investigations of PHANTOM SECURE, there are more than twenty-thousand PHANTOM SECURE devices in use worldwide, including approximately 10,000 in Australia. According to law enforcement sources in Australia, Canada, and the United States, PHANTOM SECURE devices are used by the upper echelon members of various transnational criminal organizations to communicate with their criminal compatriots and conduct the illegal activities of the organization. These law enforcement sources all report that <u>they are unaware of any law enforcement partner that has identified even a single legitimate PHANTOM SECURE user.</u>

21.   Based on reports of RCMP, Australia and United States financial investigators and agents that I have reviewed, bank records, corporate ownership filings in Canada, Singapore, and Hong Kong show that PHANTOM SECURE generated tens of millions of dollars in revenue by facilitating the crimes of transnational criminal organizations and protecting these organization from detection by law enforcement. I have talked to other who have reviewed financial records and I believe PHANTOM SECURE funnels the proceeds from device and service sales through several shell companies.

22.    Further, based on statements made by ███████████ , I know that to launder its ill-gotten gains and maintain its members' anonymity the PHANTOM SECURE ENTERPRISE uses cryptocurrencies, including Bitcoin, and shell companies.

B.  *The Phantom Secure Enterprise Knowingly Conducts and Aids and Abets Transnational Drug Trafficking and Other Criminal Activity*

23.    According to CW-1, some members of the Sinaloa Cartel – the drug trafficking organization with whom he associated – used PHANTOM SECURE devices to communicate and coordinate their criminal activities.  According to CW-1, PHANTOM SECURE devices were specifically designed, marketed, and distributed to transnational criminal organizations, specifically drug trafficking organizations.

24.    According to information I received from RCMP, from March through August of 2015, RCMP successfully purchased PHANTOM SECURE devices by posing as drug traffickers.  During the vetting process, an undercover agent asked the PHANTOM SECURE representative if it was safe to send messages that explicitly discussed drug trafficking, using the following examples, "cocaine coming up" and "sending MDMA to Montreal."  PHANTOM SECURE's employee replied that speaking explicitly was "totally fine" because the servers were "based in Panama" and "no one has access" to "our servers."

25.    As part of the RCMP investigation, PHANTOM SECURE personnel were asked by the RCMP to delete an associate's PHANTOM SECURE device after "learning" that police had arrested this associate.  In response to this request, the following conversation occurred:

| | |
|---|---|
| *RCMP*: | So, he picked up the load [of drugs] and I think he's been arrested and I need, there's a lot of evidence and fuckin' shit on my Blackberry. |
| *Phantom Secure*: | Yeah. |
| *RCMP*: | I need that evidence gone, ASAP. |
| *Phantom Secure*: | You wanna wipe both of them? |

| RCMP: | Yes. |
| *Phantom Secure*: | Okay then…. |
| RCMP: | Oh, you're a lifesaver. |
| *Phantom Secure*: | One sec. |
| RCMP: | And, but the thing is, cops can't access it, right? |
| *Phantom Secure*: | They can't even access that anyways, yeah. |

26. ███████████ to protect the anonymity of its client base, PHANTOM SECURE attempts to limit the distribution of its handsets to individuals associated with organized crime, and RAMOS has coached ██████ to conceal PHANTOM SECURE's clients' true identities and occupations. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[REDACTED]

29.   As a representative example of RAMOS's knowing facilitation of transnational drug trafficking, [REDACTED] multiple undercover agents met with RAMOS in Las Vegas on February 8-9, 2017. The undercover agents posed as high-ranking members of a transnational drug trafficking organization seeking secure communications and data deletion services to facilitate an expansion of their drug trafficking activities in South America and Europe. During the recorded meeting, RAMOS made the following admissions:

a.   RAMOS explained that PHANTOM SECURE was built specifically for the purpose of facilitating drug trafficking:

| Undercover: | Three of my main guys are in prison |
|---|---|
| RAMOS: | Mhm |
| Undercover: | I lost, like, 50 kilos coming out from Colombia |
| RAMOS: | Okay. You don't have to tell me that, but it's okay. |
| Undercover: | Yea, well, We're all friends. |
| RAMOS: | Just saying it out loud. |

*[conversation continues]*

| Undercover: | It's, there's a lot of exposure right here. There's a lot. |
|---|---|
| RAMOS: | Of course. That's - |
| Undercover: | You know, we don't know you. |

RAMOS:              Of course. That's what I'm saying. You don't know me. But, yeah that's exactly what I'm saying, right. <u>We made it-we made it specifically for this [drug trafficking] too.</u>

     b.    RAMOS continued by saying he was confident in the PHANTOM SECURE product and assured the undercover agents that PHANTOM SECURE's technology would not be compromised. As to drugs lost in transit, RAMOS said: "I've seen and heard from other people just 'cause I'm in this business. That it is, um where people, when it happens [drugs are seized by law enforcement] to people all of, a lot of informants in, somebody already inside. Ninety-nine percent of the times."

     c.    In response to a statement from an undercover agent that GPS functionality on a PHANTOM SECURE telephone was necessary to facilitate targeted murders of criminal associates suspected of betraying the organization, RAMOS responded, "Right, right, right, right." Later in the conversation, RAMOS assured the undercover agents that PHANTOM SECURE's encryption could not be "hacked" and that the primary vulnerability of this type of communication was an "informant." RAMOS said "from what I [have] experienced it's always cooperation, ya know." An undercover agent responded: "Which goes back to the GPS issue," implying the group would need to locate and kill the informant. RAMOS responded, "Yeah, it does."

     d.    When asked what action the transnational criminal organization should take if one of its members was "pinched," RAMOS responded as follows:

Undercover:        What is it that you recommend. What's the first thing we should if we get word that someone got pinched and we need to just kind of -

RAMOS:              You'd probably want to –

Undercover:        having them fall off the radar

RAMOS:              You'd – you'd want, um, send a wipe command to his device.

Undercover:        A lot of concern from a lot of people here, we have that, ya know, I guess reassurance that they are gonna be able to be remotely taken care of.

| RAMOS: | Right.  But I but the only thing is when you're saying the remotely wiped, it has to have a connection to the network.  Because what they do now with that they have a Faraday bag.  You can put the device into the bag and it does not emit any signals if you put it into like, a lab to avoid wipes. |
|---|---|
| Undercover: | Who has that? |
| RAMOS: | <u>What I'm saying, the authorities, the "unfriendlies" [law enforcement] do</u>. |

    e.    Ultimately, in furtherance of the purported worldwide expansion of their drug trafficking activities, the undercover agents purchased from RAMOS ten PHANTOM SECURE devices and incident services at a cost of $20,000 for six months. Subsequently, the agents renewed service on the devices at an additional cost of $25,000.





C.  *Select Acts Aiding and Abetting Drug Trafficking Committed By The*
    *Phantom Secure Enterprise*

37.    According to law enforcement in the United States, Australia, and Canada,
and documents and evidence collected during this investigation, PHANTOM SECURE
ENTERPRISE conducted or aided and abetted the following racketeering acts:

38.    CW-1 stated that over the course of several years, his drug trafficking
organization moved hundreds of kilograms of cocaine per month from Mexico through
the United States, ultimately destined for Canada and Australia.  CW-1 used a
PHANTOM SECURE device to coordinate and complete each of these drug transactions.

39.    In a series of PHANTOM SECURE messages that I have reviewed from
July 18, 2015 through August 5, 2015, CW-1 and the undercover agent discussed and
confirmed the details of a five kilogram cocaine transaction.  CW-1 and the undercover
agent agreed that the delivery would take place at a hotel in Del Mar, California.  CW-1
stated that he would send "Junior" to make the cocaine delivery.  In fact, on August 5,
2015, Rufus Rhone, aka Junior, arrived at the prearranged hotel in Del Mar California.
Upon arrival, Rhone gave an undercover agent one kilogram of cocaine.  After testing a
sample and confirming that it was cocaine, the undercover agent gave Rhone $90,000
and Rhone provided the undercover agent the remaining four kilograms of cocaine.  In a
series of PHANTOM SECURE messages with CW-1, the undercover agent confirmed
that the five-kilogram cocaine delivery had occurred as planned.

40.    According to information provided by international law enforcement
partners, in August 2015, using PHANTOM SECURE devices provide by ███████ CW-
1 and his Australian conspirators coordinated a shipment of 10 kilograms of cocaine from
the U.S. to Australia, which was seized by the Australian Border Force.

41.    According to CW-1, as well as witness interviews and communications that
I have reviewed, after CW-1 and the undercover agent completed the August 5, 2015 five
kilogram cocaine deal, CW-1 arranged to have five kilograms of methamphetamine
delivered to the undercover agent.  Using his PHANTOM SECURE device, CW-1

coordinated the delivery of the methamphetamine on September 8, 2015, one day before CW-1's arrest on September 9, 2015.

42.    According to communications that I have reviewed, during a five-day period – from September 4, 2015 through September 9, 2015 – CW-1 and his associates communicated over PHANTOM SECURE devices provided by ████████ to coordinate the shipment of more than 135 kilograms of cocaine from Los Angeles to Canada. Following CW-1's arrest, PHANTOM SECURE attempted to wipe CW-1's PHANTOM SECURE device, but the attempt failed because the wipe command failed to reach CW-1's device.

43.    Leading up to September 2016, the Australian Federal Police were surreptitiously operating a PHANTOM SECURE device seized from an Australian national who was arrested for drug smuggling.   During this period, the AFP communicated with an unknown individual in Los Angeles who packaged and shipped 16 kilograms of cocaine to Australia where it was intercepted on September 11, 2016.

44.    In March 2017, FBI agents in Los Angeles surveilled EMERSON loading multiple duffle bags into a large truck at known drop point. After the truck left the area, local police stopped the truck and seized 194 kilograms of cocaine.  Incident to the truck driver's arrest, FBI agents seized his PHANTOM SECURE device.  During a brief consensual review of the PHANTOM SECURE device, agents determined it had been used to coordinate the receipt and subsequent delivery of the cocaine.  The truck driver warned that the PHANTOM SECURE device would be erased if he failed to check in within a specific period, and indeed, within hours of his arrest, PHANTOM SECURE remotely wiped this device and the evidence on his PHANTOM SECURE device was deleted.

45.    In June 2017, undercover agents used a target's PHANTOM SECURE device to communicate with "the Goat," a known drug trafficker located in Canada. This operation ultimately led to the arrest of Saysana Luangkhamdeng as he attempted to smuggle MDMA into the United States and the seizure 24 kilograms of MDMA.



several times a year for several years.  He also admitted that he knew CW-1 was a drug trafficker when he was selling those devices to CW-1.



## REQUEST TO SEAL AND DELAY NOTICE

51.    Based on my training and experience and the investigation of this matter, I respectfully submit that reasonable cause exists to seal this affidavit and arrest warrant.  The investigation is ongoing, and premature disclosure of the warrant will compromise ongoing operational activities in the United States and worldwide, including through the destruction of evidence, the notification of other subjects of the investigation, including PHANTOM SECURE client-customers, the flight from prosecution by RAMOS, ███████████████████ or others who are subject to arrest, and the endangerment of the life or physical safety or the intimidation of ██████ CW-1 and other potential witnesses in this case.

## CONCLUSION

52.    Based on my training and experience, and the evidence detailed above, I believe there is probable cause that RAMOS, ███████████████████

violated Title 18, United States Code, Section 1962 (RICO), Title 21, United States Code, Sections 841 and 846 (Conspiracy to Distribute a Controlled Substance).


_____

Special Agent Nicholas Cheviron
Federal Bureau of Investigation

Subscribed to and sworn before me
this ___ of _____, 2018.


_____

The Honorable Mitchell D. Dembin
UNITED STATES MAGISTRATE JUDGE